withdrawal. Mr. Gautreaux? Thank you, Your Honors. May it please the Court, my name is Jerome Gautreaux, and together with Jesse Vaughn, we represent Mr. Cantrell on this appeal. Your Honors, we are respectfully requesting that this Court reverse the grant of judgment on the pleadings by the District Court in this case, in this excessive force case. There are several reasons for our request, Your Honor, but primarily it revolves around this main guiding principle, and that is that the judgment was prematurely granted on a record essentially devoid of any developed facts. Very unusual, it's very unusual in this circuit and in all the circuits for judgment on the pleadings to be granted in an excessive force situation. It's not that it's unheard of, but it's just somewhat rare. Thank you. Your Honors, in this case, the District Court, the universe of facts that the District Court had before it really only consisted of our well-pleaded complaint allegations and some videos that were included and are included in the record on appeal. So the universe of facts here is very, very limited in scope and detail. But we do know this much. We know from the video, and there's no dispute that your client was driving while under the influence because there's no dispute about that. We know that he engages in a high-speed chase. Police come after him. They put on their siren. They direct him to stop. He does not. We know from the film that he continues to speed at a high rate. And the film suggests at one point he was driving his car at 56 miles per hour in a residential area near schools and homes. We know from the film that he misses another car, just barely. And we know that he crashes it into a park. We know further that he's directed to get out of the car. He flees then into the park. And we know that when he comes out of the park, a different officer sees him and tackles him. Those are the facts that we have in front of us, right? No dispute about any of that, or is there? Maybe some minor dispute, Your Honor. I very much wish I didn't have to admit about 90 percent of what Your Honor just said. But unfortunately, I do. So, yes. So he has violated a variety of ordinances in the process. While the police could have behaved differently, the question is, they were certainly free to use some force. Why were they not free to tackle him under these circumstances without running afoul of the Fourth Amendment and excessive force prohibitions? Yes, Your Honor. I think it's a fairly simple, these cases are never simple, really. But in this case, we can at least look at the factors that this Court and every circuit and the Supreme Court has said are relevant to the inquiry as to whether or not an officer can use deadly or near-deadly force. And this was deadly force as defined by the circuit. Usually, when we speak of deadly force, we talk about the use of a firearm or a car itself we've defined as, under some circumstances, deadly force. But I know of no case that has ever said tackling the defendant in and of itself amounts to deadly force, rather than that the tragic consequence of the tackle was that he was rendered comatose for 12 days. But have we ever suggested, or has the Supreme Court ever suggested, that tackling a defendant under circumstances like this would be excessive or deadly? Not that directly that I'm aware of, Your Honor. There have been cases, I believe, Your Honor, involving such things as striking and choke holds, but not a tackle, not that specific. And I don't think we need to show it's that specific, Your Honor, because this circuit has said that deadly force is simply defined as force that creates a substantial risk of causing death or serious bodily harm. But we are in a qualified immunity posture, and the Supreme Court has said that even the use of deadly force when there is, when the person is not armed, is not enough. Haven't they said that? I'm sorry, Your Honor, I may have misunderstood your question. Can you repeat it, please? Has not the Supreme Court said the use of deadly force itself is not enough in a qualified immunity situation? It's too general. You have to have specific facts in order to rise to the level of surmounting qualified immunity. I think that the level of generality is somewhere between vague statements of the law and the specific factual circumstance presented to the officer. I don't think it has to be, nor has any case ever said, it has to be the exact factual circumstances. That would be — that would sort of be unrealistic because of the myriad of factual circumstances confronting officers. But what we do know is that this — The only question that I'm raising is whether this is fairly characterized as deadly force. It might be that if you had a middle linebacker who weighed 260 and was playing for the San Francisco 49ers and he was running at high speed, 20 yards, and smashes a guy, a receiver, in the head, that could be deadly force. But that's not quite what we have here. Well, that's — you've pointed up the problem, Your Honor. One of the problems here is that we don't know exactly how big Officer McClure is. He looks big to me in the video. He's certainly moving at high speed. We do know how far away he was, right? As far as the video can determine, yes, Your Honor. Well, there's no suggestion that the video inaccurately recorded the confrontation between the officer and your client. No. So how far away would you realistically say the officer was from your client when he sees your client walk away and then turn around? What was the distance between McClure and Cantrell? I don't know. The district court didn't know. And we can't know today because — It wasn't 100 yards we could say that. It wasn't even 20 yards. We can say that, can't we? It wasn't measured, Your Honor. It was not 100 yards. I'll certainly agree with you. But it was — my estimate would be something like maybe 30 feet, 35. That's my best guess, just looking at a video with no measurements. But we don't know. We don't know the answer to that question, Your Honor. On this record, we simply do not know. And that's one of our contentions here, is that if you look at the video, and Your Honors may have already looked at it, no matter what the distance was, it is absolutely clear from the video that Mr. Cantrell had no weapon. Even though the district court mentions the knife, the district court also concedes it cannot say on the record that there was a knife involved. It's not apparent from the video that he's armed at all, which is one of the factors this Court considers. It's not apparent that he's — the Court seemed to say that Mr. Cantrell was trying to evade police. That is not a fair inference on this record at this stage of the proceedings. He was simply — Well, depending on how you define what he was doing, if you start at the beginning, it seems to me undeniable that he was trying to elude the police. They put on the sirens. They say, stop. He refuses and takes them quite a distance on a high-speed chase, and then crashes his car into the park, and they demand he stop again, and he flees at that point. The only point at which you could say maybe he wasn't fleeing was on the back end when McClure comes upon him. And that's very important, Your Honor, because what's important are the facts and circumstances. As this Court has said, what's important are the facts and circumstances confronting the arresting officer, not what preceded the arrest. Well, I thought under our law, we ask the question in terms of what an objectively reasonable officer would have done knowing all of the attendant facts and circumstances. That is to say, we would ask whether McClure, if he knew everything that had preceded it, acted in a reasonable way. I don't – sorry. No, no. So the mere fact that McClure may not have known the prehistory doesn't seem to me to be of any great moment here. Am I missing that? I've struggled a bit with this issue myself in reading the cases, Your Honor, because it's not always clear what is the universe of facts and circumstances that we consider the Court should consider when evaluating the use of force. But it seems to me a fair reading of the cases suggests that we don't give officers super-knowledge of everything that preceded the arrest. Instead, we give them knowledge of the facts and circumstances confronting the officers at the time of the arrest. And so I don't think the cases support that kind of super-knowledge. Judge Marcus is probably thinking about the opinion he wrote in Terrell v. Smith. And I'll quote from that. Furthermore, both the United States Supreme Court and the Florida Supreme Court have allowed the collective knowledge of the investigating officers to be imputed to each participating officer. So I think what Judge Marcus just said is the law of our circuit, that we have to assume that McClure knew everything that Officer Dover knew. And furthermore, it seems to me there's a common sense and the only reasonable inference from these pleadings that Officer McClure did know crucial facts. Because we know from the, even if you, I know you don't like having the first video in shows the car stopping abruptly, shows the plaintiff seeing that officers are there turning around and walking. And it shows, and this is what is significant, the officer, McClure, obviously knew that this was the person that Officer Dover had been chasing because he didn't say anything. He just ran and tackled him, which means that he knew, he was the only reasonable inference, it seems to me, is that he knew that this was the person that they were looking for. And therefore, he knew, even without Terrell v. Smith, I think there are reasonable inferences that he knew the crucial facts about what the plaintiff had been doing. Do you think I'm wrong there? I don't think the facts support all of that, with respect, Judge Anderson, because surely he knew that the man needed to be apprehended. That's clear. Well, sure. We don't dispute that. It wasn't just a random occurrence. Is there any other reasonable inference why he would know that? We don't know what McClure knew when he came upon Mr. Cantrell in this sort of wooded area. We don't know. It's not in the record because the case was decided so prematurely. We do know he obviously knew this man needed to be apprehended. We do know that much. But the district court went much further. He did. He did. And under Terrell v. Smith, he was entitled to. Was he not? I don't think no. I do not agree with that, Judge Anderson, with respect. You don't agree with our decision? Not that, Your Honor. Just his application to this case. All right. Because the district court on page 9 went much further than just saying, you know, the officer had knowledge of these circumstances. He also said something like, he said exactly this, plaintiff was noncompliant. Well, that's not a reasonable inference on this record. It might be a reasonable inference after facts were developed and at summary judgment. He did. He did see the officers and turn around and walk the other way, did he not? No, he did not, Your Honor. I wouldn't say that's a reasonable inference. He turned around and sort of did a little circle, it looks like to me. He looked confused to me, Your Honor, about what to do. He sort of gave this dismissive wave, like to me it suggested I'm caught and I'm given up. And then his arms are out by his side, clearly showing no weapon. And then he turns and puts his hands up. And three steps, by my count, are taken by the officer. So what is it that McClure should have done that he didn't do that yields liability? I'm sorry, Your Honor. What is it that McClure should have done here that he didn't do that yields liability? One thing he should have done is given a verbal command to the man to stop and put his hands up. He could have very easily done that without subjecting himself even to the risk of a knife that he says Mr. McCantrell had. An officer wouldn't have wanted to tackle a man with a knife because you might get stabbed yourself. So the intelligent thing to do, the smart and cautious thing to do for everybody involved would have been to order him to stop and put his hands up and surrender, not launch headfirst into a tackle that could have killed the man. We're all talking about seconds here, aren't we? Aren't we talking about the policeman making a decision and moving in seconds? Yes. And aren't we supposed to be objectively looking at the objective reasonableness of his behavior? Yes, Your Honor. If he thought the man was walking away, it's true he may have turned around, but by that time the decision had already been made. Isn't that reasonable on the part of the officer? I would submit it is not, Your Honor, because if you look at the video, you'll see that there was an intervening period of time when a decision very easily could have been made after he pulled up to where Mr. Cantrell appeared on the roadway. The officer very easily could have decided, I'm going to make him stop and put his hands up, but it appears to me that he decided at that instant, I'm going to tackle this guy for whatever reason. Whatever reason would be whether we believe that he knew what had gone before, namely that this individual had eluded, done everything he could to elude arrest, right? And in light of that, whether it was objectively reasonable for an officer to rush headlong and tackle this man, who the officer says had a knife, rather than simply ordering him to cease movement. We are over time, but I think we ought to insert in the conversation the Prevatt case. And that informs, even though it's an unpublished opinion under our precedent, it informs the officer in the sense that if the appellate court doesn't know any better, then the officer certainly wouldn't. So what bothers me about your case is that we've got almost, I won't say identical, but a very, very similar situation involving a tackling, involving raising hands almost simultaneously with the contact, which in my view of the video, which I've looked at many, many times, I think there's less than a second. In fact, in my view of it, when the plaintiff began to raise his hands, McClure was already bending over in the beginning of his crouch to tackle, which is very similar to what our court said in Prevatt that it was almost simultaneous. So we've got that kind of similar situation, which informs this officer that it was not clearly established there, and it seems to me it would be extremely hard for us to say not only that the officer's actions were objectively reasonable, but they were so clearly objectively reasonable that every officer in his shoes would have realized that was so. You see my problem? I hate to have to disagree with Your Honor again, but respectfully, I have to disagree with the analysis of Prevatt and how it applies to this case, because to me the similarities with Prevatt are only superficial. Because in Prevatt, we had a suspect who is, in the case, 30 feet from an elementary school. He is carrying a rifle or had been carrying a rifle that he put down near him. He had dropped that before, and there was a considerable time so that I don't think there's a whole lot of difference. Our plaintiff here abandoned his car. He was certainly dangerous if he had his car in the same way Prevatt was dangerous if he had his knife and gun, but Prevatt had already dropped that. Well, the gun and knife were near Prevatt's feet, Your Honor, so that any movement, any slight movement, it looked to me like he could have obtained those weapons and done harm to either the children nearby or the officers confronting him. That is not the case here, at least on this record. We don't know where his car was or how close it was to Mr. Cantrell. We know he had been in a car, but certainly, unlike Prevatt. We know pretty much because in the first video, you could see from where the officers were in the first video, you could see McClure's car coming. So it was across some woods to another road. Yes, unlike Prevatt, where it was right within a few feet. It was closer. In Prevatt. I guess we would dispute that, Your Honor, but I understand what you're saying, Your Honor. I think Prevatt is not, is distinguishable. Thank you, sir. Thank you, Your Honor. Mr. Saverin. Good afternoon. It's not the morning anymore. Philip Saverin for City of Ellijay. I guess there are two things that my opponent said that surprised me. The first one was saying that the facts in the record are very limited. There's an old saying that a picture tells a thousand words. Well, so many more words does a video tell. If we did not have the video and we had to dig through testimony and recollections and different perspectives, that would be one question. But what we have here is not only a video that there's no dispute as to its accuracy, but it shows directly what Officer McClure confronted and is focused on the entirety of the event. And what that event shows, setting aside what preceded it, what that event shows very clearly is that Mr. Cantrell comes up the bank, sees the police officer, and you can tell from the video that his lights are on, dismissively waves him like, I don't care about you. Starts walking, looking up the hill, looking for an escape route, turns around. Well, by then, Officer McClure, according to the district court, the entire episode was three seconds from the time he exited the vehicle until Mr. Cantrell was on the ground. By the time he turns around, Officer McClure is already on his way to seize Mr. Cantrell. At that point, he half-heartedly puts up his hands. What Mr. McClure — what Mr. Cantrell might have done had he intended to surrender was when he first saw the officer, put up his hands. He could have gotten down on the ground. He could have verbalized, you had me. Don't his hands go up before he's tackled? A second. According to the district court, it was a second before. It was, as in the Prevatt case that Judge Anderson mentioned, it was almost simultaneously. By then, it's too late for him to stop. Otherwise, someone could be disobeying and then all of a sudden put up their hands, and the officer would have to freeze while their momentum is already going to them. What Mr. McClure did beforehand would show to — I'm sorry, what Mr. Cantrell did beforehand would show by his actions that he was not going to surrender. He was still trying to flee. So I think that is important as far as the universal facts in the case. The second thing that my opponent said that I was surprised by, if I heard it correctly, he called this deadly force. In the Prevatt case, it very clearly called it nonlethal force, even though the result in that case, as in this case, was a serious injury. It also surprised me because in all the briefing, he referred to it as nearly deadly force or near deadly force, and then tried to analogize it with the Mercado case and some others where a firearm was used or, in the Mercado case, it was a sage launcher, which was termed a less lethal but still lethal force against someone's head. I don't think there's any way that this could be considered deadly force under any definition of the Supreme Court or of the Eleventh Circuit. I think what's important is some of the admissions that the plaintiff has made in the complaint as well as in the record and in the video. One is in the complaint itself, even if we did not have the video, he states that an officer of the police department, in paragraph 7, attempted to stop his vehicle. The next paragraph, he says that he exited his vehicle and proceeded on foot. That's a fancy way of saying he was fleeing. The next paragraph, paragraph 9, says, Defendant McClure proceeded to intervene in the traffic stop. So he's already imputed the knowledge about the traffic stop and Mr. Cantrell failing to comply to Officer McClure. He also has admitted that he took a step away from the officer before raising his hands. He's admitted that he surrendered immediately before, this is in his appellate brief, immediately before he was taken to the ground. He said that, also that, this is in the appellate brief, that when he saw McClure running, that that was when he put up his hands, when he saw that the seizure was inevitable, that there was no means of escape. The video I've gone over, what it shows with Mr. Cantrell, clearly shows someone who knows that he's wanted by the police, knows that this officer is there to stop him, and is still trying his best to get away until the very last second when it's inevitable. The other issues I wanted to mention, and, of course, the standard rules about even if the officer reasonably but mistakenly perceived the circumstances that that is not a substantive violation. I don't think there's any question here that there's any clearly established law. The cases that I've cited to are deadly force cases. One that was decided afterwards, but is not anything similar to what we have here. The district court, of course, dismissed the Monell claims, saying that if there was no constitutional violation, there could not be Monell liability. We have an alternative argument that the allegations are about conclusions only. Those would be in paragraphs 38 to 40 and 57 to 60, that they're only allegations of law, but that would not satisfy the standard of the Twombly and Iqbal cases. And then on the State law claims, there's no actual malice alleged for official immunity purposes. And the plaintiffs have abandoned any official capacity claims under State law against the city. And finally, even if this Court were to reverse on the Fourth Amendment qualified immunity, Monell issues, and the State law, there's a statute of limitations defense that the judge reserved based on the lack of diligence in serving the complaint. So unless there are any questions, that's our position. We think it's pretty clear that based on the record and the case law, the facts that are pled by the plaintiff and as supplemented up by the video that they've admitted is accurate that the district court's decision should be affirmed. Thank you, sir. Thank you very much. Mr. Filtrow, he has mentioned the Monell issue and you did not address that. I would appreciate if you would include that in your remarks. Yes, Your Honor. Sure. The district court dismissed the Monell claim on the same grounds that he dismissed the claims against the individual officers, finding that there was no constitutional violation. And so the Monell claim, according to the district court, had to fail on that ground. What about the merits of it? I think that was the district court's main conclusion, Your Honor. I said, what about the merits of the Monell issue? Yes. Well, I think I've addressed the fact that we believe that the constitutional Fourth Amendment violation did occur in this case simply by application of this court's factors analyzing that situation. Assume we do not reach the Fourth Amendment issue itself and resolve that portion of the case solely on the qualified immunity issue, then we would have to reach the Monell issue. And the argument from the other side is that your allegations are wholly conclusory with respect to any liability on the part of the city. Yes, Your Honor. We have alleged, as far as the policy or custom requirement of Monell to hold a municipality liable, I believe we have addressed this in our brief, but I believe we've adequately alleged that the custom or policy of the city of Ellijay was the moving force behind the constitutional violation. It is true that we have not put in anything in the complaint about the precise contents of such a policy because it's so early in the case we'd hardly be able to do that. There's been no discovery conducted, Your Honor. But as far as alleging the Monell claim, I think we've met the applicable standard to do that in terms of alleging a policy or custom. Your Honor, the main factor this Court has always considered in excessive force cases is whether the suspect poses a risk of harm to others or to the officers. It seems to me all the factors kind of revolve around that main factor. Here, it cannot reasonably be concluded, we contend, on this stage of the proceedings, at least, that Mr. Cantrell, while acting stupidly, no doubt, and we have to face that, he was not posing a risk of serious harm to others or to the officers. He was not armed. He was not resisting. They may want to characterize him as running away, but that's not a fair characterization at this stage of the proceedings, although it may appear later. At this stage of the proceedings, that's simply not a fair conclusion to say that Mr. Cantrell was a serious risk of harm. Acting stupid and being a big harm to somebody, posing a risk of harm, is not the same thing. And as to the statute of limitations issue, I wanted to address that, Your Honor. The district court mentioned the statute of limitations but didn't decide the case on that basis, so we tried to address it in our brief. On the trying to anticipate alternative grounds that this Court may consider, one thing we did not put very clearly or maybe at all in the brief is this issue of tolling the statute of limitations under the Georgia tolling provision for mental incapacity. In the complaint, we say that Mr. Cantrell suffered a coma. He was in a coma for 12 days after this injury and 22 days in the hospital. We believe that if we are able to conduct some discovery, we'll be able to support the idea that his mental incapacity tolled for some period of time the statute of limitations and that a determination on that basis should await the development of a factual record. Any questions? Thank you very much. Thank you, Your Honor. The Court will be in recess until tomorrow morning. All rise.